# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Case No. 22-cr-301 (CJN) |
| v. | : | |
| | : | |
| DOVA WINEGEART, | : | |
| | : | |
| Defendant | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Dova Winegeart to 12 months of incarceration, one year of supervised release, $2,729 in restitution, and $10 in mandatory special assessment.

## I.    Introduction

Defendant Dova Winegeart, a 51-year-old who is unemployed, violently participated in the January 6, 2021 attack on the United States Capitol that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Winegeart was convicted at trial of Destruction of Government Property, in violation of 18 U.S.C. § 1361. The government's sentencing recommendation is supported by Winegeart's aggressive assault on the Capitol building. Her criminal conduct included violently swinging a metal-tipped wooden pole at a glass window in an effort to break the window in the midst of a violent riot and gain access to the Capitol building. She also displayed aggression towards police officers who were defending the Capitol on that day. Her incessant vitriol against police revealed her intent and purpose in joining the mob on January 6: to stop the Congressional certification of the Electoral College Vote in the 2020 Presidential Election. Her continued lack of remorse and refusal to accept responsibility for her crimes, as well as her actions in destroying evidence, continued threats to witnesses and those involved in the prosecution of rioters from January 6, and her refusal to fully participate with the probation office following her conviction strongly support a significant sentence of incarceration.

The Court must also consider that Winegeart's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. Further, the Court made several specific factual findings about the violent and disruptive nature of the defendant's conduct during January 6, 2021. But for her actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Winegeart's crime support a sentence of 12 months of incarceration, one year of supervised release, $2,729 in restitution, and $10 in mandatory special assessment.

## II.     Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 1-1 (Statement of Facts).

*Defendant Winegeart's Role in the January 6, 2021 Attack on the Capitol*

Prior to January 6, 2021, Winegeart followed the reported results of the 2020 presidential election and traveled to Washington, D.C. to participate in marches protesting alleged election fraud, such as the "Million Maga March II" held in Washington, D.C., on December 12, 2020.  *See* Ex. 708. While at that December march, Winegeart met and took photos with members of the Proud Boys.



*Image 1: Photograph of Winegeart posing with members of the Proud Boys*

Winegeart also visited the East Front of the U.S. Capitol Building in December 2020 and took several photos of her visit.  *See* Exs. 519, 550, 517, 513.

On January 6, 2021, Dova Winegeart traveled back to Washington, D.C. to attend the "Stop the Steal" rally in support of then-President Donald Trump. Ex. 708. Winegeart posted on TikTok[2] a montage of her travel to DC. Ex. 585. The montage, with an overlay of "Hold on, Sir, We The People are on our way" shows multiple scenes of highway travel, Winegeart wearing a Proud Boys shirt, and references to Women for Trump and the American Patriot Party. *Id.*

After attending the "Stop the Steal" rally, Winegeart and her husband, Terry Winegeart, made their way to the East Plaza of the Capitol Grounds. Winegeart wore a long red coat with black buttons, black eyeglasses, a white head/ear warmer, black shoes, and black gloves.



*Image 3: Photograph of Wingeart's attire on January 6, 2021*

Winegeart arrived on Capitol grounds around 3:04 p.m., as captured by Capitol Police surveillance footage. *See* Exs. 301-306. She passed lines of barricades on her arrival at the East Plaza, as well as dozens of emergency and law enforcement vehicles. Ex. 565.

Once on restricted Capitol grounds, Winegeart darted towards the nearest entrance to the Capitol building. She quickly approached the "East Front House Chamber Doors" on the House

---

[2] After January 6, 2021, Winegeart deleted her TikTok account and all postings.

of Representative's side of the Capitol. Ex 307. Those doors lead directly to the House Chamber

where the certification had been taking place.



*Image 4: Screenshot of Government Trial Exhibit 307 showing Winegeart (yellow rectangle)
climbing the stairs towards the East Front House Chamber Doors*

Once at the top of the stairs, at approximately 3:08 p.m., Winegeart quickly approached

the doors.



*Image 5: Screenshot of Government Trial Exhibit 300 showing Winegeart
approaching the East Front House Chamber Doors*

She first looked through the window and aggressively banged on the windowpane with her

hands in a fist. Ex. 317 at 3:08:05 p.m.



*Image 6: Screenshot of Government Trial Exhibit 317 showing Winegeart using her fist to aggressively bang on the windowpane*

Police officers were present and visible through that window. While still facing the window and police officers visible through the window, Winegeart then raised her middle finger and yelled "FUCK YOU!" *See* Ex. 317 at 3:08:11 p.m.



*Image 7: Screenshot of Government Trial Exhibit 317 showing Winegeart flipping her middle finger at police officers and yelling "FUCK YOU!"*

Winegeart continued using her fist to forcefully bang on the window. Ex. 317 at 3:08:13 p.m. She then acquired a wooden pole that had metal eyebolts at the top and middle of the pole. Winegeart turned to the crowd gathering behind her, held up the wooden pole, and addressed the

crowd (the content of which was not captured on the surveillance footage that does not record audio).



*Image 8: Screenshot of Government Trial Exhibit 300 showing Winegeart holding the metal-tipped wooden pole and addressing the crowd*

After addressing the crowd, Winegeart faced the door, gathered herself, and wound up for a swing. Using her whole body, Winegeart aggressively swung the wooden pole at the windowpane. As she forcefully struck the door, shards of material littered the ground.

Winegeart immediately swung the pole a second time with sufficient force that, when the pole contacted the window, the pole broke into two pieces. *See* Govt Exs. 402, 500, 504, 530.



*Image 9: Screenshot of Government Trial Exhibit 300 showing Winegeart swinging the metal-tipped wooden pole at the windowpane*

Winegeart reached down to pick up the then-broken pole and stood up, looking at the door she had just attacked, holding both parts of the pole, one in each hand. *See* Govt Ex. 300.

Before she could attack the door again, her husband, Terry Winegeart, reached the top of the stairs and rushed towards her, trying to pull her back. *Id.* Even though her husband was attempting to pull her back from the door and stop her from further attacks (after disarming her of the pole), Winegeart resisted, attempting to shake or throw Terry's hands off her.



*Image 10: Screenshot of Government Trial Exhibit 300 showing Terry Winegeart attempting to pull Winegeart away from the door*

Winegeart turned and addressed the crowd again.



*Image 11: Screenshot of Government Trial Exhibit 300 showing Winegeart yelling to the crowd after she bashed the window with the pole*

Finally, her husband led Winegeart away from the door, just as someone else rushed forward to take photos of the damaged window that Winegeart had just attacked.

After attacking the windowpane, Winegeart walked down the steps to the landing next to the South side of the Capitol building and approached a line of metal barricades. Winegeart immediately attempted to engage with officers from the Metropolitan Police Department, who were, at that time, part of a police cordon behind the barricade facing the rioters. Winegeart engaged in an hour-long harangue against the officers, where she repeatedly offered to pay a full year of the officers' bills if they abandoned their posts defending the Capitol. *See* Ex 601.[3] Winegeart told the officers "don't be corrupt!" and incessantly encouraged them to "walk away." *Id.* At one point during her diatribe, Winegeart exclaimed to another rioter, "I wanted to storm the Capitol, so bad.  That's why I came here."

After her failed attempt at breaking into the Capitol building and failed attempt at bribing police officers to abandon their post, Winegeart left the Capitol grounds.

### *Valuation of the East Front Door Damage*

Following the events of January 6, 2021, the Architect of the Capitol assessed damage to the East Front Door windowpane—the same windowpane that Winegeart forcefully struck with a wooden pole—and determined that the damaged glass windowpane needed to be replaced.  The parties stipulated that the cost to replace the broken glass windowpane was $2,229.

### *Dova Winegeart's Statements and Actions After January 6, 2021*

After her participation in the riot, Winegeart deleted text messages that she sent on January 6, 2021, her Parler account, and her TikTok social media account.  Ex. 704; Joint Stipulations at

---

[3] This was likely a dishonest bribe offer: except for a brief stint running a bakery that went bankrupt, Winegeart has been unemployed "for years" and relies entirely on her husband's income to support herself.  PSR ¶ 89.

¶¶ 37, 49; *see also* Ex. 706 (Winegeart stating that she needed to "burn my phone in the next few days" after the FBI attempted to interview her).

In the text messages that Winegeart did not delete, Winegeart explained her intentions regarding her participation in the riot. For example, on January 7, 2021, Winegeart sent text messages to a personal acquaintance explaining that "[i]t got crazy" after the "storm of [the] capital," and bragging that she "did shit." *See* Ex. 714. Winegeart sent a photo of herself swinging the pole at the window and followed by saying, "Yes we are mad. Yes we want to go inside Capital. It's our building. Not the governments. We are their bosses but get treated like dogs. I'm done with this government. It's fight time non stop now. They asked for it." *Id.*

After the acquaintance asked Winegeart if she did anything inside the Capitol, Winegeart replied, "No I didn't go inside couldn't break open alone. Moved onto balcony with cops after. Pieces of shit." *Id.* Winegeart then criticized then Vice President Pence and Senator Schumer, calling them "pussies" for hiding during the riot. *Id.* At the end of the conversation, Winegeart sent a Tweet from Elon Musk that advised people, on January 7, 2021, to "Use Signal" rather than unencrypted text messages for communications. *Id.*

Winegeart also sent text messages to members of her family bragging about her participation in the riot. For example, she sent text messages to her son that said, "I walked up to the capital and said let me in and I will bang on that door again." and explained that, "Your step dad watched me do that thing at the capital." Ex. 707.

Despite deleting several of her social media accounts after January 6, Winegeart continued to use Twitter/X to discuss her participation in the riot. She recast history, making claims, for example, that the mob on January 6 was "peaceful"—despite Winegeart's own acts of violence.

Since January 6, Winegeart has also taken actions to retaliate against people who have cooperated with the FBI during the investigation into the January 6 attack on the Capitol. For example, in an interview with the FBI, Winegeart's husband admitted that he and Winegeart "were present at the Capitol," that Winegeart "hit the door with the stick," and that he had to disarm Winegeart of the stick and pull her away from the Capitol door. After her husband spoke with the FBI, Winegeart publicly blamed her actions on him, repeatedly identified her husband as the "enemy," and threatened to tell the authorities that he encouraged Winegeart to "break down the door" and that he was "guilty too." Winegeart threatened, "fuck with me & ill fuck you[] too."

Then, after her trial, Winegeart took to social media to threaten government witnesses who provided information to the FBI about Winegeart. For example, in a Facebook group that Winegeart operates, Winegeart vigorously attacked and threatened a witness—by name—in retaliation for the person's cooperation with the FBI. Winegeart publicly called the witness a "lying, conniving, immoral horrible excuse for a human," an "oversized jealous kunty," and threatened that Winegeart would do everything she could to make sure the witness is "held accountable."

Winegeart attempted to orchestrate a campaign of ostracization against this witness and implied that Winegeart would ruin this witness's life in retaliation for the person cooperating with the FBI. *See* Exhibit A at 1-2.[4] Winegeart has also publicly stated, in the same context of threatening this witness, "I don't want money. I want revenge," *id.* at 15, and "Swatting and giving false information on purpose, like [witness name] likes to do, is highly punishable. Stay frosty losers," *id.* at 17; *id.* at 26 (explaining that she used discovery from the case to identify individuals

---

[4] This witness has reported feeling concern for their safety and the safety of their family as a result of Winegeart's incessant and serious threats and has reported these threats to local law enforcement.

who assisted in the investigation); *id.* at 22 ("100 Harborist and have the patience to see that the vengeance is so much worse than they'd ever expect").

Also in retaliation for this witness's cooperation with the FBI, Winegeart went as far as to taunt the witness about the tragic death of the witness's two-year-old son. *See, e.g.*, *id.* at 13 (Winegeart posting: "I have one thing you yearn for. A blonde haired, blue eyed, son. You are undeserving. I didn't tag you The Devil arbitrarily. I hope you remember these words every time you visit his grave or you think of him." and ended with "Burn in hell [initials].").

Winegeart has also threatened investigators and prosecutors, publicly posting on social media, for example, that she needed help identifying the "unlawful hunters." She reposted a poll on social media stating that "all January 6 prosecutors and other federal employees" should be criminally charged for their "actions weaponing government." She tweeted on Twitter/X that "We will have all of your names very soon," and added, "Hunting the hunters. What's good for the goose…" Exhibit A at 3-8 ("I look forward to watching everyone that helped hunt down a J6er experiencing being hunted down in the near future."); ("You hunters are now being hunted."), *id.* at 10; *id.* at 24 (stating that it will be her "full time job" sedition hunting beginning on January 20, 2025).

Winegeart has also publicly appeared on podcast channels to discuss her participation in the riot. For example, in one interview, Winegeart stated that the events of January 6 were a "set up." When asked whether she believed that January 6 was "pre-planned," Winegeart agreed that it was and stated, "I was totally on an opposite side not knowing what the fuck was going on and got entrapped."[5] After another commentator on the show stated he would use facial recognition

---

[5] *See* https://x.com/i/broadcasts/1BdGYEmvOYQGX.

software to identify federal agents who were at the Capitol building on January 6 and hunt them down, Winegeart nodded with approval.

Winegeart has also repeatedly reflected how "corrupt" the Court is. *See* Exhibit A at 18-19. She has publicly asserted that the Court and the Probation office is "fake bs" and gives "ridiculous recommendations," again, refusing to understand the wrongfulness of her conduct or seriousness of her offense, she has publicly doubled down, celebrating comments that she will "come out being a leader of a gang." Exhibit A at 20; *see also id.* at 23 (reposting that "No J6er can get a fair trial in DC!").

*The Charges and Trial*

On September 9, 2022, the United States charged Winegeart by a 5-count indictment with violating 18 U.S.C. § 1361, 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 18 U.S.C. § 1752(a)(4), and 40 U.S.C. § 5104(e)(2)(F). On July 16, 2024, following a bench trial, the Court found Winegeart guilty of 18 U.S.C. § 1361 and not guilty of the other counts.

**III.    Statutory Penalties**

Winegeart now faces sentencing for violating 18 U.S.C. § 1361. As noted by the U.S. Probation Office, Winegeart faces up to twelve months of imprisonment and a fine of up to $100,000. PSR ¶¶ 98, 110.

**IV.    The Sentencing Guidelines and Guidelines Analysis**

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful

study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR.

| | | |
|---|---|---|
| Base Offense Level | U.S.S.G. § 2B1.1 | 6 |
| Possession of Dangerous Weapon | U.S.S.G. § 2B1.1(b)(16) | 14 |
| Obstruction of Justice | U.S.S.G. § 3C1.1 | +2 |
| Total Adjusted Offense Level | | 16 |

*See* PSR at ¶¶ 33-38.

**Specific Offense Characteristic: U.S.S.G. § 2B1.1(b)(16):** The offense involved possession of a dangerous weapon [to wit: a long wooden pole with metal attachment] in connection with the offense. The Guidelines instructs that, if the resulting offense level is less than level 14, increase to level 14. *See* U.S.S.G. §2B1.1(b)(16); PSR at ¶ 34.

**Obstruction of Justice**: A two-point enhancement for obstruction of justice is warranted here. After Winegeart's participation in the riot, Winegeart erased relevant text messages from her mobile telephone that she sent on January 6, 2021 and deleted her social media account that contained information related to her travels to Washington, D.C. *See* Joint Stipulations at ¶¶ 37, 49. Additionally, following trial, Winegeart made numerous threatening statements, including online postings threatening a government witness. *See* U.S.S.G. § 3C1.1 (examples of covered conduct include threatening or attempting to threaten a witness).

**Zero-Point Offender Adjustment:** U.S.S.G. § 4C1.1 provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 does not apply in this case, because Winegeart used violence or the credible threat of violence against property. Judges of this Court have defined violence as "[t]he use of physical force," typically "accompanied by fury, vehemence, or outrage" and "unlawfully

exercised with the intent to harm." It can also be defined as "the "exertion of any physical force so as to injure or abuse." *United States v. Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 4-5; *see also United States v. Hernandez*, No. 21-cr-445 (CKK), ECF No. 65 at 5 (adopting Judge McFadden's definition of violence from *Bauer*).

Here, Winegeart's conduct amounts to a textbook definition of violence. Winegeart, with her body and full force, violently swung a metal-tipped wooden pole at a glass window in attempt to break the window during a riot. Immediately before swinging the pole, Winegeart flipped her middle finger at police officers and yelled, "FUCK YOU!" and pounded on the window. Winegeart's violent acts against property were committed with the intent to attack and destroy the window.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[6]

**Guidelines Range:** The U.S. Probation Office calculated Winegeart's criminal history score as 0, category I. PSR at ¶ 45. Accordingly, the U.S. Probation Office calculated Winegeart's total adjusted offense level at 16, and her corresponding Guidelines imprisonment range at 21 to 27 months. PSR at ¶ 98 (noting, however, that the statutorily authorized maximum term of imprisonment is one year).

---

[6] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under § 4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.    Sentencing Factors Under 18 U.S.C. § 3553(a)

Sentencing is also guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 12 months of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Winegeart's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.

Although Winegeart was convicted only of a misdemeanor, her violent and aggressive acts of bashing a windowpane in attempt to "storm" the Capitol and her vitriol-filled harassment of police officers who put their lives on the line to protect the Capitol building and its lawful

occupants demonstrates that the nature and circumstances of her actions on January 6 were of the utmost seriousness.

This is particularly true given the circumstances of the attack. Winegeart arrived at the Capitol grounds and took photos of the disheveled bike racks and the numerous emergency vehicles around her. She moved quickly towards the House of Representatives door and immediately began violently banging on the door and yelling profanities at the officers standing inside the door. It was clear that the Capitol was under attack and it was clear that the door was secured for a reason. Winegeart took matters into her own hands when she equipped herself with a metal-tipped wooden pole, bashed the window, and turned to animate the crowd.

After she failed to break into the Capitol, she resorted to a manipulative tactic, attempting to encourage police officers to abandon their posts, going as far as bribing the officers by repeatedly offering to pay their bills for a full year if they abandon their post at the Capitol. Winegeart begged and pleaded for a full hour. Winegeart was not passive, she was not caught up in the crowd, and she was not justified in her actions. Rather, Winegeart arrived at the Capitol and immediately took matters into her own hands, independent of the crowd she walked through, as she attempted to "break open" the door and "storm" the Capitol.

Additionally, the Court acquitted Winegeart of Count Two, in violation of 18 U.S.C. § 1752(a)(1); Count Three, in violation of 18 U.S.C. § 1752(a)(2); and Count Four, in violation of 18 U.S.C. § 1752(a)(4), on the basis that the government did not prove beyond a reasonable doubt that Winegeart knew Vice President Pence or his family were at the Capitol on January 6, 2021. *See* Trial Verdict at 16-20 (Count Two), 20 (Count Three), 20 (Count Four) (7/16/2024) (explaining that it was not a "home run" for the defense, but nevertheless finding that the

government did not prove this element beyond a reasonable doubt).[7] For all three of these counts, however, the Court found that the government "did prove beyond a reasonable doubt" the *actus reus* requirements. *See id.* at 20. In fashioning an appropriate sentence, the Court should consider the proven actions Winegeart took that plainly encompassed entering and remaining on restricted grounds, disorderly and disruptive conduct on restricted grounds, and engaging in physical violence on restricted grounds.

Accordingly, the nature and the circumstances of this offense establish the clear need for a maximum sentence of incarceration in this matter.

### B.  Winegeart's History and Characteristics

As set forth in the PSR, although Winegeart's criminal history category is I, she has a history of breaking the law and refusing to comply with law enforcement officials. For example, Winegeart was convicted of driving under the influence and without a driver's license after she drove her vehicle into a ditch while intoxicated and refused to have her BAC taken. PSR ¶ 44. Winegeart also has faced the following criminal charges: (1) assault causing physical injury, (2) prostitution, (3) obtaining property with worthless checks, (4) simple battery, and (5) issuing a worthless check. PSR ¶¶ 47-51. Winegeart has several traffic offenses too, including failure to obey traffic control device, speeding, operating a vehicle with expired tags, and a red-light violation. PSR ¶ 46.

---

[7] On October 22, 2024, after this Court rendered its verdict in this case, the D.C. Circuit held that the government was *not* required to prove, under 18 U.S.C. § 1752(a)(1), a defendant's knowledge of the Vice President's presence was the reason that the grounds remained restricted. *United States v. Griffin*, 119 F.4th 1001 (D.C. Circuit 2024). The element of the Secret Service protectee's presence in the location where the defendant was unlawfully present is common to all subsections of § 1752(a). Accordingly, the rationale of *Griffin* should be extended to violations of § 1752(a)(2) and (a)(4).

Additionally, consistent with Winegeart's patterned failure to cooperate with law enforcement, in this case, Winegeart has refused to sign releases of information, thereby preventing the Probation Office from verifying information to prepare for sentencing. PSR ¶ 54; *see also* Verdict Tr. at 32:2-9 ("There will be a Presentence Investigation Report prepared by the Probation Office. They will interview you. And they'll . . . . prepare a report that assists me in sentencing.").

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence:* The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v.*

*Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37). General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence:* There is a strong need for specific deterrence in this case. Since January 6, 2021, Winegeart has engaged in a pattern of highly concerning rhetoric. Simply put, Winegeart does not think she did anything wrong on January 6, 2021. Rather, she has undertaken a role of advocacy on behalf of the participants in the attack on the Capitol, continuing to refer to the rioters as "patriots," defending their actions as righteous, and attempting to recast history in a light favorable to a mob that disrupted the peaceful transition of power. Since the attack on the Capitol, Winegeart has failed to display any remorse for her actions, she has not accepted responsibility for her role in the attack, and she has not displayed any sense of appreciation for the harm or gravity that the January 6 attack had on our nation. Instead, she publicly blames the riot on public officials and government agencies, all while refusing to acknowledge her role and her actions on that day. Winegeart also has used social media to celebrate that she was acquitted of all charges (untrue), boast that she is proud of her actions, and intimidate her "enemies," *i.e.*, witnesses and investigators, by publicly calling for and intimating revenge and retribution. Moreover, Winegeart has refused to cooperate with the Probation Office even after her conviction by refusing to provide requested information. The Court must sentence Winegeart in a manner sufficient to deter her specifically, and others generally, from going down this road again, and to ensure respect of the courts and the rule of law.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[8] This Court must sentence Winegeart based on her own conduct and relevant characteristics, but should give substantial weight to the context of her unlawful conduct: her participation in the January 6 riot.

In *United States v. Dylan Cronin*, 22-cr-233 (ABJ), the defendant was convicted following a guilty plea to 18 U.S.C. § 1361 and 18 U.S.C. § 1752(a)(1). Cronin approached the Capitol on the West Front and sprayed a fire extinguisher on the Upper West Plaza. He then assisted in the breach of the Senate Wing Door by kicking at the window and using a piece of lumber to break the windowpane. After other rioters finished the job of breaking through the door and ultimately breaching the building, Cronin entered the building and stayed inside until he and other rioters were forced out. Judge Berman Jackson sentenced Cronin to eight months of incarceration.

Here, like Cronin, Winegeart used a wooden object to violently swing at a windowpane in attempt to break the windowpane. Although Winegeart, unlike Cronin, did not gain entry into the Capitol, it was not for lack of trying.  Twice she slammed the metal-tipped pole into the windowpane, and stopped only when the force of her strikes broke the pole in two. Winegeart's actions and intent matched Cronin's.

Cronin, moreover, accepted responsibility through entering a guilty plea; Winegeart has not. Plus, Winegeart has the additional aggravating factors of remaining on Capitol grounds for an

---

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

additional hour as she attempted to bribe officers to abandon their posts, the deletion of evidence, her continued lack of remorse, the continued harassment of government witnesses, and the failure to cooperate with the probation office. Thus, a longer sentence is warranted for Winegeart.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.    Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).

Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property . . . including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii); *see Fair*, 699 F.3d at 512 (citation omitted). Because Winegeart was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, applies only to certain

offenses, such as a "crime of violence, § 3663A(c)(1)(A), or "Title 18 property offenses, 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[9]

Because Winegeart engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and her criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold Winegeart responsible for her individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"); *see also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic compuation," but simply make a "reasoned judgment.").

More specifically, the Court should require Winegeart to pay $2,729 in restitution for her conviction on Count One, which encompasses $500 in restitution for Winegeart's participation in the Capitol riot, consistent with January 6 cases where the parties have entered

---

[9] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

into a guilty plea agreement and consistently agreed upon $500 in restitution in misdemeanor cases, as well as $2,229 for the cost to repair the damage to the East Front House Door windowpane that Winegeart twice struck with a metal-tipped wooden pole in attempt to break into the Capitol building. *See, e.g.*, *United States v. Grady*, 18 F. 4th 1275, 1289 (11th Cir. 2021) (citing 18 U.S.C. § 3664(h), which provides, "[i]f the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant).

Although Winegeart was not convicted of the enhancement that makes this conduct a felony, she nevertheless willingly and forcefully twice struck a window with a metal-tipped wooden pole in attempt to break it, and she should be held accountable for damages to that door. *Accord United States v. Bowe*, 360 F.2d 1, 8 (2d Cir. 1966) (A plan to "blow off the head and arm of the Statue of Liberty . . . contemplated damages in excess of" the felony amount, "***even though no actual damage was completed***") (emphasis added); *see also United States v. Bilyard*, 22-cr-34 (RBW) (awarding $1,500 restitution for damaging a window and $2,000 for participation in the Capitol riot); *United States v. Ehmke*, 21-cr-126 (TSC) (awarding $2,821 restitution for damaging for windowpanes where other rioters also contributed to the damage); *United States v. Bozell*, 21-cr-216 (JDB) (awarding $2,729 restitution for damaging for windowpanes where other rioters also contributed to the damage and $2,00 for participation in the Capitol riot); *United States v. Faulker*, 21-cr-126 (BAH) (awarding $10,560 restitution for damaging windowpanes); *United States v. Kenyon*, 21-cr-726 (CJN) (awarding $41,315.25 restitution for damaging a window and $2,000 for participation in the Capitol riot); *United States v. Grider*, 21- cr-22 (CKK) (awarding $3,044 restitution for damaging the House Speaker's

lobby doors and $2,000 for participation in the Capitol riot); *United States v. Gardner*, 21-cr-622 (APM) (awarding $1,500 restitution for damaging for a window and $2,000 for participation in the Capitol riot).

### VII.   Fine

The defendant's conviction subjects her to a statutory maximum fine of $100,000 for Count One. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that she is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine, § 5E1.2(a), (e). The guidelines fine range for Offense Level 16 is $5,000 to $50,000. U.S.S.G. § 5E1.2(c).

### VIII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Winegeart to 12 months of incarceration, one year of supervised release, $2,729 in restitution, and $10 in mandatory special assessment. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Winegeart's liberty as a consequence of her behavior.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     s/ *Ashley Akers*
Senior Trial Counsel
MO Bar No. 69601
Detailed to the Capitol Siege Section
601 D Street NW
Washington, D.C. 20005
Ashley.Akers@usdoj.gov
202-353-0521

/s/ *Patrick Holvey*
Patrick Holvey
Assistant United States Attorney