UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| ) | |
| v.                                              ) | Case No. 22-cr-00301-CJN |
| ) | |
| DOVA WINEGEART.,                 ) | |
| ) | |
| Defendant         ) | |
| ) | |

**DEFENDANT DOVA WINEGEART'S SENTENCING STATEMENT**

William L. Shipley
PO Box 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com
*Attorney for Defendant*

1

I. <u>Introduction</u>

Comes now Defendant Dova Winegeart by and through her undersigned counsel of record, William L. Shipley Esq., and submits to this Court her Sentencing Statement in advance of the Sentencing Hearing on December 9, 2024.

Defendant Winegeart appears for sentencing before this Court having been found guilty by the Court after a one day bench trial of only the lesser included offense to Count One charged in the Indictment, a misdemeanor violation of 18 U.S.C. Sec 1361, Attempted Destruction of Government Property involving damage of an undetermined amount.

Defendant Winegeart faces a statutory maximum penalty of up to 12 months imprisonment and a fine up to $100,000.

II. <u>Sentencing Guidelines Calculation</u>

A violation of 18 U.S.C. Sec 1361, Attempted Destruction of Government Property, is a Class "A" misdemeanor with a maximum term of imprisonment of up to 12 months.

<u>Defendant's Guideline Calculation</u>:

| | |
|---|---:|
| **Base Offense Level:** | **6** |
| Specific Offense Characteristics: | 0 |
| Victim Related Adjustment: | 0 |
| Adjustment for Role in the Offense: | 0 |
| Adjustment for Obstruction of Justice: | 0 |
| Adjustment for Acceptance | -2 |
| Adjusted Offense Level **(Subtotal):** | **4** |
| Chapter Four Enhancement: | 0 |
| **Total Offense Level:** | **4** |

Based on an offense level of 4, and a criminal history score of 1, the Recommended Guideline Range is 0-6 months.

<u>PSR Guideline Calculation</u>:

The Guideline Calculation of the Presentence Report:

| | |
|---|---:|
| **Base Offense Level:** | **6** |
| Specific Offense Characteristics: | +8 |
| Victim Related Adjustment: | 0 |
| Adjustment for Role in the Offense: | 0 |
| Adjustment for Obstruction of Justice: | +2 |
| Adjusted Offense Level **(Subtotal):** | **16** |
| Chapter Four Enhancement: | 0 |
| **Total Offense Level:** | **16** |

The Presentencing Statement includes two enhancements – the base offense level is recommended to be increased to Level 14 based on "possession of a dangerous weapon," and a +2 level enhancement is recommended for "obstruction" under Sec. 3C1.1. The PSR calculates the Adjusted Offense Level as 16.

    a. <u>Acceptance of Responsibility.</u>

The PSR denies the Defendant the benefit for acceptance of responsibility. But the facts are that the only plea offer extended by the government was for Ms. Winegeart to plead guilty to the felony violation of Sec. 1361, the crime on which she was acquitted. The Court further acquitted her on all the remaining counts in the Indictment filed against her. Having prevailed on every count with which she was charged – including the only felony which was the basis for the only plea offer made – Ms. Winegeart should

3

not be penalized in her Guideline calculation for having been forced by the Government to defend herself at trial on a felony given that she prevailed. This case fits within the narrow exception recognized in Sec. 3C1.1 where a defendant can meet the standard for acceptance notwithstanding the fact that she was compelled by circumstances to take the matter to trial. Ms. Winegeart never denied she swung the pole at the door – she denied that she caused damage to the door in excess of $1000 in having done so.

    b. <u>Dangerous Weapon Enhancement</u>.

The PSR increases the base offense level to Level 14 under Sec. 2B1.1(b)(16) on the erroneous finding that Ms. Winegeart possessed a "dangerous weapon." Section 2B1.1 does not include a definition of "dangerous weapon".

Section 1B1.1, Application Note 1(E) defines a "dangerous weapons" as "an instrument capable of inflicting death or serious bodily injury." The problem here is that the physical nature of the pole possessed by Ms. Winegeart remains a matter of speculation. While the video evidence might seem to suggest from its appearance that the poll could have been capable of "inflicting death or serious bodily injury," the reality is that the pole broke in half after two strikes against the door in the hands of a rather diminutive woman. That creates an issue of doubt as to whether the physical nature and wood composition of the pole was such that it actually met the standard set forth in the definition in the Application Note to Sec. 1B1.1.

    c. <u>Obstruction of Justice</u>.

4

The PSR increases the adjusted offense level by +2 under Section 3C1.1 based on a claim that Ms. Winegeart obstructed justice by deleting text messages and her TikTok account. The facts that supposedly support this enhancement are not set forth in the PSR.

But Application Note 1 to Sec. 3C1.1 makes clear that this enhancement only applies if the alleged obstructive conduct was connected to the investigation or prosecution of a defendant. If the allegedly obstructive conduct took place prior to the start of the investigation, the enhancement only applies when the Government can show "the conduct was purposefully calculated, and likely to thwart the investigation or prosecution of the offense of conviction." The PSR includes no facts establishing when the conduct in question occurred and whether it was "purposely calculated" to interfere with or obstruct an investigation or prosecution. The Government's Sentencing Statement does provide some information in this regard, however, the Government's Statement does not establish the date(s) of the obstructive conduct, that the conduct was "purposely calculated" to interfere in the investigation, and that the obstructive conduct "likely thwarted" the offense of conviction – the attempt violation of Sec. 1361. As the Government notes, extensive text messages and social media data was obtained during the course of the investigation. This cuts against the view that Ms. Winegeart engaged in any conduct "purposely calculated" to obstruct an investigation.

III.   The Offense Conduct.

5

The PSR is somewhat accurate in its description of Defendant Winegeart's conduct while at the Capitol; however, many inaccuracies that were revealed by the evidence at trial are present in the PSR. The Offense Conduct seems to have been taken nearly word-for-word from the Affidavit filed in support of the Criminal Complaint. As a consequence the Offense Conduct is not based on the evidence presented at trial and is in many respects inconsistent with both the verdicts rendered and the explanation given by the Court in support of those verdicts.

Similarly, the Government's Sentencing Memorandum relies heavily on factual allegations and evidence that were deemed insufficient to support guilty verdicts at trial.[1] While Ms. Winegeart acknowledges that the scope of "Offense Conduct" and "Relevant Conduct" can be broader than just the evidence found to support the guilty verdict on a single charge, the Offense Conduct section of the PSR should not read as if no trial ever took place, and none of the evidence offered by the Government was subjected to cross-examination and contrary evidence.

The facts of this case are not complicated nor are they lengthy and involved. Because the Court is intimately familiar with the facts from having heard and considered the evidence at trial, Ms. Winegeart isn't going to add to the reading here by including that which the Court already knows. However,

---

[1] Defendant Winegeart acknowledges that since the date of the trial and rendering of the verdicts, the Court of Appeals has resolved the split among the District Judges on the question of whether "actual knowledge" of Vice President Pence's presence at the Capitol was an element of the offenses charged under 18 U.S.C. Sec. 1752. It is possible that if the trial was held today, the verdict on those counts might have been different. Because of that, the Court can certainly consider he conduct with regard to those counts in a bit different light. But the nature of her conduct isn't changed by the Court of Appeals decision.

some comments with regard to the description of the facts and evidence in the PSR seems necessary and appropriate.

**THE PSR**

Paragraph 17 refers to a large wooden pole with a "metal attachment." When the Government referenced this object during its argument about the use of the pole with a "metal tip" the Court noted that without the pole itself in evidence, it was not possible to say conclusively what the nature of that object attached to the end of the pole actually was. Because the video did not present a clear enough view to reach a conclusion, it was not possible to say that it was a metal object or something else with a similar appearance.

Paragraph 18 refers to the broken glass in the panel of the door, stating that the glass was damaged by the "pointed metal attachments on the wooden pole that [D]efendant Winegeart swung several times at the window." This was a point of contention at trial and viewing the video evidence frame-by-frame it was clear that the end of the wooden pole struck the door frame next to the glass – and did not strike the glass itself.

Further, Paragraphs 18 and 19 refer to the cost of the damage done being in excess of $1,000, without ever mentioning the evidence presented at trial showing all the damage to the glass was done before Ms. Winegeart swung the pole the first time, and that the location of the damage to the glass was at a height significantly higher than the height at which the diminutive Ms. Winegeart swung the pole on a horizontal plane. Based on the evidence, the Court acquitted Ms. Winegeart on the felony charge that she was responsible

7

for damaging the glass to the door. The claim made in the PSR that Ms. Winegeart is responsible for the damage to the glass should be stricken.

**Government's Sentencing Memorandum**

On page 3 makes a reference to Ms. Winegeart's travel to Washington D.C. to participate in the December 12, 2020 march. The Government tries to draw some meaningful connection between Ms. Winegeart and the Proud Boys "extremist group" because Ms. Winegeart posed for a photo with Proud Boys who also attended the December 12, 2020 march. But the December trip is not "relevant conduct" and making any reference/use to it intrudes on Ms. Winegeart's First Amendment right to political free speech.

On page 7 the Government makes reference to the pole having a "metal tip." Because the pole was not recovered and examined, this is nothing more than mere speculation.

On page 9 the Government makes reference to the costs of the repairs of the door. The parties did stipulate the cost to replace the glass was $2,229. However, Ms. Winegeart was not responsible for the damages – that issue was resolved at trial on the evidence – and the damage to the door is irrelevant with regard to this case.

IV.     Sentencing Factors Under Sec. 3553(a)

8

Pursuant to 18 U.S.C. § 3553(a), certain numerous factors must be taken into account by the Court in formulating an appropriate sentence in this case.

The facts of this case, including the facts of the offense and factual circumstances pertinent to the Defendants background and personal characteristics, should inform this Court with respect to the following issues to be considered pursuant to Sec. 3553(a):

1. Nature and circumstances of the offense and the history and <u>personal characteristics of the defendant</u>.

   a. <u>The Nature and Circumstances of the Offense</u>.

For the most part the actions of the Defendant's on January 6 are not in dispute. As many Judges in this District have recognized after studying the events of January 6 in great detail, the crowd at the Capitol that day can be generally categorized as having three primary constituent parts:

1) a relatively small group of individuals who came to the Capitol with the intent to engage in violence for the purpose of disrupting the Congress's certification of the 2020 Electoral Vote count for the purpose of interfering with the peaceful transfer of Presidential power between Administrations.

2) a larger number of protesters who intended to protest in a loud and raucous manner as a manifestation of their unhappiness and distrust with regard to the outcome of the election, but with no predetermined intention of engaging in violence. Some in this second group were drawn into acts of violence once at the Capitol as a result of what they observed and the way events unfolded; and

9

3) an even larger group who remained as spectators to what developed into a riot by members of the first two groups.

Ms. Winegeart's conduct on January 6, 2021, straddles the line between the second and third groups. She arrived long after the most serious violence on the East Side of the Capitol had ended, and never went to any area around the Capitol other than the Southeast corner where she spent approximately an hour. Ms. Winegeart's time at the Capitol was almost entirely spent as a spectator, aside from two very short episodes during the course of that hour.

The Columbus Doors in the middle of the East side of the Capitol had been breached at 2:38 – before Ms. Winegeart arrived. During her time at the Capitol there was a large crowd at the center staircase leading to the Columbus Doors, and the staircase on the Southeast corner where she was. During that time there were only a few police on the outside of the building, and there were no episodes of violence between the crowd and the police while she was there. As was noted by the Court during the trial, what Ms. Winegeart learned about the violence and property destruction that happened that day she learned from watching the news that night in her hotel room.

Ms. Winegeart traveled to Washington D.C on January 5, 2021, with her husband in anticipation of attending the "Stop the Steal" Rally at the Ellipse where then President Trump was scheduled to speak on January 6, 2021. At the conclusion of the rally, Ms. Winegeart and her husband traveled to the Capitol, arriving on the South East corner at approximately 3:04 PM.

At approximately 3:08 PM Ms. Winegeart made her way up the stairs to the East Front House Chamber, posing for photos and a video being taken by

10

her husband who was with her.  Upon arriving at the door into the House side of the Capitol on the southeast corner, Ms. Winegeart "knocked" or "banged" on the glass pane in the window several times, and made an obscene gesture through the glass when no one responded.

Somewhere in her immediate vicinity, Ms. Winegeart found what appears on video to be a wooden pool of some kind – but decorative in nature.  While holding the pole she turned to face the individuals who had formed into a crowd behind her, several with cameras out to capture on video what it was she seemed about to do next.  She motioned for her husband to come closer to where she was, then she turned away from the crowd and struck the door frame with the pole twice in rapid succession.  The second blow caused the pole to break in half.  Ms. Wingeart then made another statement to the crowd before being led away by her husband.  Then went down the staircase until coming to a location where a police line was formed.  She remained at that location for nearly an hour, engaging in a running commentary directed at various police officers in that location until Ms. Winegeart and her husband left the Capitol grounds approximately one hour after arriving.

      b.  <u>History and Personal Characteristics</u>.

While the PSR gives a generally accurate overview and description of Ms. Winegeart's personal history, and there are issues that need further clarification and context to more fully understand, Ms. Winegeart has made the decision that she does not wish her personal history to be the subject of an

extended exposition in writing in a publicly filed document.  Medical records relevant to Ms. Winegeart's personal history have been previously submitted to the Court under seal and Ms. Winegeart requests that the Court include the information in those records as part of its consideration of the Sec. 3553(a) factors.

The Government's Sentencing Statement – coming as it does after having lost on the most significant substantive matters at trial – is largely an exercise in character assassination.  The Government focuses on things Ms. Winegeart has said or done in her past – most of which the Government finds objectionable as a general proposition, i.e., she's just not a very nice person in the Government's view.

While there is no hiding from the comments Ms. Winegeart has made in various forums going all the way back to January 6, 2021 – including comments made since the trial -- to seek to impose "punishment" based not on her criminal conduct but because her comments are deemed to be distasteful or offensive is a clear violation of the First Amendment.

This isn't any less true simply because the Government makes allegations that some of her comments online in through other media are directed at "witnesses."  That is a curious description given that no such witnesses were called at trial, Ms. Winegeart has never faced charges for obstruction in the form of witness intimidation, and no obstruction enhancement is being sought based on her comments to and about these "witnesses."

The simple fact of the matter is that no one is compelled to like or be polite towards anyone. Ms. Winegeart is blunt and unforgiving in her commentary about others, she is irascible and easily provoked even if unintentionally, and unsparing in her criticisms of others whom she believes have wronged her. To the extent the Government's rationalization for seeking a term of imprisonment is based on this kind of character assassination, the Court should simply disregard the arguments and focus instead on what Ms. Winegeart did at the Capitol on January 6.

> 2. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other <u>correctional treatment in the most effective manner</u>.

This Court, as a matter of justice and equity, should treat Defendant Winegeart as it would any other misdemeanant convicted in connection with the riot at the Capitol on January 6, particularly those who engaged in the same or similar offense conduct, i.e., committed no act(s) of physical violence towards the police, did not do any actual damage to the building or other property, and never failed or refused to follow directions given by the police. She never entered the Capitol, remaining outside during a period of time when the Columbus Doors were open and protesters were entering and exiting the building a short distance from where she remained for an hour before departing altogether.

While Ms. Winegeart expressed herself in hostile and objectionable ways towards the law enforcement officers near her, that is political speech during

13

an emotionally charged event. It would intrude on her First Amendment rights for this Court to use her running commentary during the period after striking the door as a basis to elect to impose a term of incarceration as part of her sentence.

Given Ms. Winegeart's criminal conduct on January 6, a sentence of probation is appropriate because it would adequately address the severity of the nature of her action. The imposition of any custodial time would be unnecessarily punitive. To the extent that the Court believes some curtailment of her liberty is necessary to accomplish specific deterrence, imposing some period of home confinement as a term of her probation would serve that purpose while also taking into consideration the health issues that the Court has been made aware of previously. Any custodial sentence in a Bureau of Prisons facility would be unnecessarily punitive and might lead to adverse health consequences.

In its Sentencing Memorandum, the Government focuses its attention on *United States v. Cronin*, 22-cr-233-ABJ, where the defendant pled guilty to misdemeanor violations of 18 U.S.C. Sec. 1361 and 18 U.S.C. 1752(a)(1). This is the only case the defense has found where a sentence imposed for a misdemeanor violation of Sec. 1351. But the conduct in *Cronin,* as compared to Ms. Winegeart's conduct, is vastly different.

The defendant in *Cronin* used a piece of lumber taken from construction materials on the West side to break the right-side window next to the Senate Wing Doors which was the first breach point that allowed the crowd to enter the Capitol. He did so after making several unsuccessful attempts to break

14

into the Capitol by kicking in the Senate Wing doors themselves. After successfully breaking the window and causing the loud alarm to be activated, *Cronin* was the 13th person to enter the Capitol Building at 2:13 PM. *Cronin* met with other family members who entered through the Senate Wing doors after they were breached by others, and he and his family then began to travel all through the Capitol. They exited the building for a few minutes at 2:20 PM, and then reentered at 2:24 PM, going to other parts of the Capitol, including the Crypt and Memorial Door. The defendant in *Cronin* continued through the building after separating from his family, exiting through the Columbus doors on the East side of the building at 2:46 PM. The defendant entered the Capitol for a third time at 2:48 PM, remaining near the entry on the East side until 2:56 when Officers from the Metropolitan Police Department formed a line that prevented him from moving further into the Capitol.

Judge Jackson sentenced *Cronin* to 8 months, yet inexplicably the Government seems to view *Cronin* as supporting its request for a sentence of 12 months here. The facts in *Cronin* are far more aggravating than the facts here, starting with the defendant in Cronin doing actual damage with a significant dollar loss, creating the first breach point for the rioters to gain access to the building while Congress was still in session, and then followed by repeated entries into the Capitol and spending nearly 45 minutes inside.

Ms. Winegeart did no actual damage to the Capitol, never entered the building, and remained outside as a spectator for approximately an hour before leaving of her own volition.

15

Other Judges of this Court have recognized that sentences of probation is appropriate in similar circumstances where the defendant has no prior criminal history score and there are no aggravating factors in the defendant's conduct on January 6. *United States v. Wiesmar*, 21-cr-00592-1, and *United States v. Frankowski*, 21-cr-00592-2. In each of those cases, the Government asked for a term of incarceration, but the Court determined that such a sentence was not warranted by the facts and that a sentence of probation was sufficient to address the policy considerations identified by Congress in Sec. 3553(a).

The Defendants in *Wiesmar* and *Frankowski* are similar to Defendant Winegeart – but each did more than Winegeart having gone inside the Capitol. They entered the Capitol building following the crowd and traveled to different locations while inside the building. *Wiesemar* and *Frankowski* entered Senate offices and spent several minutes inside. Similar to Defendant Winegeart, they caused no damage to the building nor engaged in any violence.

This Court should consider the sentence imposed by the Honorable Judge Mehta in *United States v. Greene*, 21-cr-00028, a defendant in the third Oath Keepers trial who was convicted only of a violation of Sec. 1752, while prevailing on four felony counts against him. The facts are similar to the extent that Greene never entered the Capitol and spent more than an hour outside the building watching and recording video of the events. Greene went to trial and was acquitted by a jury on three felony charges he faced, with a

16

fourth felony count being dismissed by the Government after the jury failed to reach a verdict.

Just as it has done here, the Government sought the statutory maximum sentence of one year in custody for Greene, but Judge Mehta rejected that request and sentenced Greene to two years probation with only the standard conditions imposed.

Ms. Winegeart is similarly situated to Mr. Greene in that she maintained her innocence as to the felony charge against her, went to trial, and prevailed. A sentence of twelve months of probation satisfies the policy considerations reflected in Sec. 3553(a), and if the Court deems it necessary to curtail her liberty, a condition that four months of her probation be served under a condition of house arrest would meet that need.

**Restitution**

The PSR accurately describes Defendant Winegeart's financial resources and ability to pay any type of fine or restitution. Defendant Winegeart has no financial accounts, holdings, or property of her own. She relies for financial support on her husband.

For reasons that are not obvious, the Government is also of the view that Ms. Winegeart should be required to pay $2,229 in restitution as the cost to repair the damage to the glass on the East Front House door, citing *United States v. Grady*, 18 F. 4th 1275, 1289 (11th Cir. 2021), where the court cited 18 U.S.C. § 3664(h), stating "[i]f the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among

17

the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant."

But The evidence at trial reflected a failure of proof on the question of whether Ms. Winegeart's action caused any damage to the door's glass pane. The damage that was reflected in the evidence was there prior to Ms. Winegeart's first swing of the pole. The damage to the window is at a location much higher than the swing plane on which Ms. Winegeart swung the pole, and the video evidence showed that the end of the pole struck the door frame, not the glass window. Even to the extent that *Grady* creates the functional equivalent of "joint-torteasor" liability with regard to the payment of restitution to a victim, Ms. Winegeart did not cause any damage and *Grady* doesn't apply to her.

DEFENDANT'S SENTENCING RECOMMENDATION

Based on above, the defense submits that a sentence of twelve months probation is an appropriate sentence for Defendant Dova Winegeart with regard to her conviction of a misdemeanor violation of Sec. 1361 based on an "attempt" theory of criminality.

Date: December 6, 2024                    Respectfully Submitted,

                                          /s/ William L. Shipley
                                          William L. Shipley
                                          PO Box 745
                                          Kailua, Hawaii 96734

                        Tel: (808) 228-1341
                        Email: 808Shipleylaw@gmail.com

*Attorney for Defendant*